Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WHOLE WOMAN'S HEALTH ET AL. *v.* JACKSON, JUDGE, DISTRICT COURT OF TEXAS, 114TH DISTRICT, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–463.   Argued November 1, 2021—Decided December 10, 2021

The Court granted certiorari before judgment in this case to determine whether the petitioners may pursue a pre-enforcement challenge to Texas Senate Bill 8—the Texas Heartbeat Act—a Texas statute enacted in 2021 that prohibits physicians from performing or inducing an abortion if the physician detected a fetal heartbeat.  S. B. 8 does not allow state officials to bring criminal prosecutions or civil actions to enforce the law but instead directs enforcement through "private civil actions" culminating in injunctions and statutory damages awards against those who perform or assist with prohibited abortions.  Tex. Health & Safety Code Ann. §§171.204(a), 171.207(a), 171.208(a)(2), (3). Tracking language from *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, S. B. 8 permits abortion providers to defeat any suit against them by showing, among other things, that holding them liable would place an "undue burden" on women seeking abortions. §§171.209(a)–(b).

The petitioners are abortion providers who sought pre-enforcement review of S. B. 8 in federal court based on the allegation that S. B. 8 violates the Federal Constitution.  The petitioners sought an injunction barring the following defendants from taking any action to enforce the statute: a state-court judge, Austin Jackson; a state-court clerk, Penny Clarkston; Texas attorney general, Ken Paxton; executive director of the Texas Medical Board, Stephen Carlton; executive director of the Texas Board of Nursing, Katherine Thomas; executive director of Texas Board of Pharmacy, Allison Benz; executive commissioner of the Texas Health and Human Services Commission, Cecile Young;

Syllabus

and a single private party, Mark Lee Dickson. The public-official defendants moved to dismiss the complaint citing, among other things, the doctrine of sovereign immunity. Mr. Dickson also moved to dismiss, claiming that the petitioners lacked standing to sue him. The District Court denied these motions. The public-official defendants filed an interlocutory appeal with the Fifth Circuit under the collateral order doctrine, which allows immediate appellate review of an order denying sovereign immunity. The Fifth Circuit decided to entertain a second interlocutory appeal filed by Mr. Dickson given the overlap in issues between his appeal and the appeal filed by the public-official defendants. The Fifth Circuit denied the petitioners' request for an injunction barring the law's enforcement pending resolution of the merits of the defendants' appeals, and instead issued an order staying proceedings in the District Court until that time. The petitioners then filed a request for injunctive relief with the Court, seeking emergency resolution of their application ahead of S. B. 8's approaching effective date. In the abbreviated time available for review, the Court concluded that the petitioners' filings failed to identify a basis in existing law that could justify disturbing the Fifth Circuit's decision to deny injunctive relief. *Whole Woman's Health* v. *Jackson*, 594 U. S. ___, ___. The petitioners then filed another emergency request asking the Court to grant certiorari before judgment to resolve the defendants' appeals in the first instance, which the Court granted.

*Held*: The order of the District Court is affirmed in part and reversed in part, and the case is remanded.

___F. Supp. 3d ___, affirmed in part, reversed in part, and remanded.

JUSTICE GORSUCH announced the judgment of the Court, and delivered the opinion of the Court except as to Part II–C, concluding that a pre-enforcement challenge to S. B. 8 under the Federal Constitution may proceed past the motion to dismiss stage against certain of the named defendants but not others. Pp. 4–11, 14–17.

(a) Because the Court granted certiorari before judgment, the Court effectively stands in the shoes of the Court of Appeals and reviews the defendants' appeals challenging the District Court's order denying their motions to dismiss. As with any interlocutory appeal, the Court's review is limited to the particular order under review and any other ruling "inextricably intertwined with" or "necessary to ensure meaningful review of" it. *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 51. In this preliminary posture, the ultimate merits question, whether S. B. 8 is consistent with the Federal Constitution, is not before the Court. P. 4.

(b) The Court concludes that the petitioners may pursue a pre-enforcement challenge against certain of the named defendants but not others. Pp. 4–11, 14–17.

Syllabus

(1) Under the doctrine of sovereign immunity, named defendants Penny Clarkston (a state-court clerk) and Austin Jackson (a state-court judge) should be dismissed. The petitioners have explained that they hope to certify a class and request an order enjoining all state-court clerks from docketing S. B. 8 cases, and all state-court judges from hearing them. The difficulty with this theory of relief is that States are generally immune from suit under the terms of the Eleventh Amendment or the doctrine of sovereign immunity. While the Court in *Ex parte Young*, 209 U. S. 123, did recognize a narrow exception allowing an action to prevent state officials from enforcing state laws that are contrary to federal law, that exception is grounded in traditional equity practice. *Id.*, at 159–160. And as *Ex parte Young* itself explained, this traditional exception does not normally permit federal courts to issue injunctions against state-court judges or clerks. The traditional remedy against such actors has been some form of appeal, not an *ex ante* injunction preventing courts from hearing cases. As stated in *Ex parte Young*, "an injunction against a state court" or its "machinery" "would be a violation of the whole scheme of our Government." *Id.*, at 163. The petitioners' clerk-and-court theory thus fails under *Ex parte Young*.

It fails for the additional reason that no Article III "case or controversy" between "adverse litigants" exists between the petitioners who challenge S. B. 8 and either the state-court clerks who may docket disputes against the petitioners or the state-court judges who decide those disputes. *Muskrat* v. *United States*, 219 U. S. 346, 361; see *Pulliam* v. *Allen* 466 U. S. 522, 538, n. 18. Further, as to remedy, Article III does not confer on federal judges the power to supervise governmental operations. The petitioners offer no meaningful limiting principle that would apply if federal judges could enjoin state-court judges and clerks from entertaining disputes under S. B. 8. And if the state-court judges and clerks qualify as "adverse litigants" for Article III purposes in the present case, when would they not? Many more questions than answers would present themselves if the Court journeyed the way of the petitioners' theory. Pp. 4–9.

(2) Texas Attorney General Paxton should be dismissed. The petitioners seek to enjoin him from enforcing S. B. 8, which the petitioners suggest would automatically bind any private party interested in pursuing an S. B. 8 suit. The petitioners have not identified any enforcement authority the attorney general possesses in connection with S. B. 8 that a federal court might enjoin him from exercising. The petitioners point to a state statute that says the attorney general "may institute an action for a civil penalty of $1,000" for violations of "this subtitle or a rule or order adopted by the [Texas Medical B]oard," Tex. Occ. Code Ann. §165.101, but the qualification "this subtitle" limits the

attorney general's enforcement authority to the Texas Occupational Code, and S. B. 8 is not codified within "this subtitle." Nor have the petitioners identified for us any "rule or order adopted by the" Texas Medical Board that the attorney general might enforce against them. And even if the attorney general did have some enforcement power under S. B. 8 that could be enjoined, the petitioners have identified no authority that might allow a federal court to parlay any defendant's enforcement authority into an injunction against any and all unnamed private parties who might seek to bring their own S. B. 8 suits. Consistent with historical practice, a court exercising equitable authority may enjoin named defendants from taking unlawful actions. But under traditional equitable principles, no court may "enjoin the world at large," *Alemite Mfg. Corp.* v. *Staff*, 42 F. 2d 832 (CA2), or purport to enjoin challenged "laws themselves." *Whole Woman's Health,* 594 U. S., at ___ (citing *California* v. *Texas*, 593 U. S. ___, ___ (slip op, at 8)). Pp. 9–11.

(3) The petitioners name other defendants (Stephen Carlton, Katherine Thomas, Allison Benz, and Cecile Young), each of whom is an executive licensing official who may or must take enforcement actions against the petitioners if the petitioners violate the terms of Texas's Health and Safety Code, including S. B. 8. Eight Members of the Court hold that sovereign immunity does not bar a pre-enforcement challenge to S. B. 8 against these defendants. Pp. 11–14.

(4) The sole private defendant, Mr. Dickson, should be dismissed. Given that the petitioners do not contest Mr. Dickson's sworn declarations stating that he has no intention to file an S. B. 8 suit against them, the petitioners cannot establish "personal injury fairly traceable to [Mr. Dickson's] allegedly unlawful conduct." See *California*, 593 U. S., at ___ (slip op, at 9). P. 14.

(c) The Court holds that the petitioners may bring a pre-enforcement challenge in federal court as one means to test S. B. 8's compliance with the Federal Constitution. Other pre-enforcement challenges are possible too; one such case is ongoing in state court in which the plaintiffs have raised both federal and state constitutional claims against S. B. 8. Any individual sued under S. B. 8 may raise state and federal constitutional arguments in his or her defense without limitation. Whatever a state statute may or may not say about a defense, applicable federal constitutional defenses always stand available when properly asserted. See U. S. Const., Art. VI. Many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one. See, *e.g.*, *Snyder* v. *Phelps*, 562 U. S. 443 (First Amendment used as a defense to a state tort suit). Other viable avenues to contest the law's compliance with the Federal Constitution also may be possible and the

Syllabus

Court does not prejudge the possibility.  Pp. 14–16.

GORSUCH, J., announced the judgment of the Court, and delivered the opinion of the Court except as to Part II–C.  ALITO, KAVANAUGH, and BARRETT, JJ., joined that opinion in full, and THOMAS, J., joined except for Part II–C.  THOMAS, J., filed an opinion concurring in part and dissenting in part.  ROBERTS, C. J., filed an opinion concurring in the judgment in part and dissenting in part, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  SOTOMAYOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BREYER and KAGAN, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–463

_____

## WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.* AUSTIN REEVE JACKSON, JUDGE, DISTRICT COURT OF TEXAS, 114TH DISTRICT, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2021]

JUSTICE GORSUCH announced the judgment of the Court, and delivered the opinion of the Court except as to Part II–C.

The Court granted certiorari before judgment in this case to determine whether, under our precedents, certain abortion providers can pursue a pre-enforcement challenge to a recently enacted Texas statute. We conclude that such an action is permissible against some of the named defendants but not others.

I

Earlier this year Texas passed the Texas Heartbeat Act, 87th Leg., Reg. Sess., also known as S. B. 8. The Act prohibits physicians from "knowingly perform[ing] or induc[ing] an abortion on a pregnant woman if the physician detected a fetal heartbeat for the unborn child" unless a medical emergency prevents compliance. Tex. Health & Safety Code Ann. §§171.204(a), 171.205(a) (West Cum. Supp. 2021). But the law generally does not allow state officials to bring criminal prosecutions or civil enforcement actions. Instead, S. B. 8 directs enforcement "through . . .

Opinion of the Court

private civil actions" culminating in injunctions and statutory damages awards against those who perform or assist prohibited abortions. §§171.207(a), 171.208(a)(2), (3). The law also provides a defense. Tracking language from *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), the statute permits abortion providers to defeat any suit against them by showing, among other things, that holding them liable would place an "undue burden" on women seeking abortions. §§171.209(a)–(b).[1]

After the law's adoption, various abortion providers sought to test its constitutionality. Not wishing to wait for S. B. 8 actions in which they might raise their arguments in defense, they filed their own pre-enforcement lawsuits. In all, they brought 14 such challenges in state court seeking, among other things, a declaration that S. B. 8 is inconsistent with both the Federal and Texas Constitutions. A summary judgment ruling in these now-consolidated cases arrived last night, in which the abortion providers prevailed on certain of their claims. *Van Stean* v. *Texas*, No. D–1–GN–21–004179 (Dist. Ct. Travis Cty., Tex., Dec. 9, 2021).

Another group of providers, including the petitioners before us, filed a pre-enforcement action in federal court. In their complaint, the petitioners alleged that S. B. 8 violates the Federal Constitution and sought an injunction barring the following defendants from taking any action to enforce the statute: a state-court judge, Austin Jackson; a state-court clerk, Penny Clarkston; Texas attorney general, Ken

_____

[1] JUSTICE SOTOMAYOR suggests that the defense described in S. B. 8 supplies only a "shell of what the Constitution requires" and effectively "nullif[ies]" its guarantees. *Post*, at 2–4 (opinion concurring in judgment in part and dissenting in part); see also *post*, at 1, n. 1 (ROBERTS, C. J., concurring in judgment in part and dissenting in part). But whatever a state statute may or may not say, applicable federal constitutional defenses always stand fully available when properly asserted. See U. S. Const., Art. VI.

Opinion of the Court

Paxton; executive director of the Texas Medical Board, Stephen Carlton; executive director of the Texas Board of Nursing, Katherine Thomas; executive director of the Texas Board of Pharmacy, Allison Benz; executive commissioner of the Texas Health and Human Services Commission, Cecile Young; and a single private party, Mark Lee Dickson.

Shortly after the petitioners filed their federal complaint, the individual defendants employed by Texas moved to dismiss, citing among other things the doctrine of sovereign immunity. App. to Pet. for Cert. 3a. The sole private defendant, Mr. Dickson, also moved to dismiss, claiming that the petitioners lacked standing to sue him. 13 F. 4th 434, 445 (CA5 2021) (*per curiam*). The District Court denied the motions. *Ibid.*

The defendants employed by Texas responded by pursuing an interlocutory appeal in the Fifth Circuit under the collateral order doctrine. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 147 (1993) (collateral order doctrine allows immediate appellate review of order denying claim of sovereign immunity). Mr. Dickson also filed an interlocutory appeal. The Fifth Circuit agreed to take up his appeal because the issues raised overlapped with those already before the court in the Texas official defendants' appeal. 13 F. 4th, at 438–439.

Separately, the petitioners also sought relief from the Fifth Circuit. Citing S. B. 8's impending effective date, they asked the court to issue an injunction suspending the law's enforcement until the court could hear and decide the merits of the defendants' appeals. *Ibid.* The Fifth Circuit declined the petitioners' request. Instead, that court issued an order staying proceedings in the District Court until it could resolve the defendants' appeals. App. to Pet. for Cert. 79a; 13 F. 4th, at 438–439, 443.

In response to these developments, the petitioners sought emergency injunctive relief in this Court. In their filing,

the petitioners asked us to enjoin any enforcement of S. B. 8. And given the statute's approaching effective date, they asked us to rule within two days. The Court took up the application and, in the abbreviated time available for review, concluded that the petitioners' submission failed to identify a basis in existing law sufficient to justify disturbing the Court of Appeals' decision denying injunctive relief. *Whole Woman's Health* v. *Jackson*, 594 U. S. ___ (2021).

After that ruling, the petitioners filed a second emergency request. This time they asked the Court to grant certiorari before judgment to resolve the defendants' interlocutory appeals in the first instance, without awaiting the views of the Fifth Circuit. This Court granted the petitioners' request and set the case for expedited briefing and argument. 595 U. S. ___ (2021).

## II

Because this Court granted certiorari before judgment, we effectively stand in the shoes of the Court of Appeals. See *United States* v. *Nixon*, 418 U. S. 683, 690–692 (1974); S. Shapiro, K. Geller, T. Bishop, E. Hartnett, D. Himmelfarb, Supreme Court Practice 2-11 (11th ed. 2019). In this case, that means we must review the defendants' appeals challenging the District Court's order denying their motions to dismiss. As with any interlocutory appeal, our review is limited to the particular orders under review and any other ruling "inextricably intertwined with" or "necessary to ensure meaningful review of" them. *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 51 (1995). In this preliminary posture, the ultimate merits question—whether S. B. 8 is consistent with the Federal Constitution—is not before the Court. Nor is the wisdom of S. B. 8 as a matter of public policy.

## A

Turning to the matters that are properly put to us, we

Opinion of the Court

begin with the sovereign immunity appeal involving the state-court judge, Austin Jackson, and the state-court clerk, Penny Clarkston. While this lawsuit names only one state-court judge and one state-court clerk as defendants, the petitioners explain that they hope eventually to win certification of a class including all Texas state-court judges and clerks as defendants. In the end, the petitioners say, they intend to seek an order enjoining all state-court clerks from docketing S. B. 8 cases and all state-court judges from hearing them.

Almost immediately, however, the petitioners' theory confronts a difficulty. Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity. See, *e.g.*, *Alden* v. *Maine*, 527 U. S. 706, 713 (1999). To be sure, in *Ex parte Young*, this Court recognized a narrow exception grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law. 209 U. S. 123, 159–160 (1908). But as *Ex parte Young* explained, this traditional exception does not normally permit federal courts to issue injunctions against state-court judges or clerks. Usually, those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties. If a state court errs in its rulings, too, the traditional remedy has been some form of appeal, including to this Court, not the entry of an *ex ante* injunction preventing the state court from hearing cases. As *Ex parte Young* put it, "an injunction against a state court" or its "machinery" "would be a violation of the whole scheme of our Government." *Id.*, at 163.

Nor is that the only problem confronting the petitioners' court-and-clerk theory. Article III of the Constitution affords federal courts the power to resolve only "actual controversies arising between adverse litigants." *Muskrat* v.

Opinion of the Court

*United States*, 219 U. S. 346, 361 (1911). Private parties who seek to bring S. B. 8 suits in state court may be litigants adverse to the petitioners. But the state-court clerks who docket those disputes and the state-court judges who decide them generally are not. Clerks serve to file cases as they arrive, not to participate as adversaries in those disputes. Judges exist to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions, not to wage battle as contestants in the parties' litigation. As this Court has explained, "no case or controversy" exists "between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Pulliam* v. *Allen*, 466 U. S. 522, 538, n. 18 (1984).

Then there is the question of remedy. Texas Rule of Civil Procedure 24 directs state-court clerks to accept complaints and record case numbers. The petitioners have pointed to nothing in Texas law that permits clerks to pass on the substance of the filings they docket—let alone refuse a party's complaint based on an assessment of its merits. Nor does Article III confer on federal judges some "amorphous" power to supervise "the operations of government" and reimagine from the ground up the job description of Texas state-court clerks. *Raines* v. *Byrd*, 521 U. S. 811, 829 (1997) (internal quotation marks omitted).

Troubling, too, the petitioners have not offered any meaningful limiting principles for their theory. If it caught on and federal judges could enjoin state courts and clerks from entertaining disputes between private parties under *this* state law, what would stop federal judges from prohibiting state courts and clerks from hearing and docketing disputes between private parties under *other* state laws? And if the state courts and clerks somehow qualify as "adverse litigants" for Article III purposes in the present case, when would they not? The petitioners offer no satisfactory answers.

Opinion of the Court

Instead, only further questions follow. Under the petitioners' theory, would clerks have to assemble a blacklist of banned claims subject to immediate dismissal? What kind of inquiry would a state court have to apply to satisfy due process before dismissing those suits? How notorious would the alleged constitutional defects of a claim have to be before a state-court clerk would risk legal jeopardy merely for filing it? Would States have to hire independent legal counsel for their clerks—and would those advisers be the next target of suits seeking injunctive relief? When a party hales a state-court clerk into federal court for filing a complaint containing a purportedly unconstitutional claim, how would the clerk defend himself consistent with his ethical obligation of neutrality? See Tex. Code of Judicial Conduct Canon 3(B)(10) (2021) (instructing judges and court staff to abstain from taking public positions on pending or impending proceedings). Could federal courts enjoin those who perform other ministerial tasks potentially related to litigation, like the postal carrier who delivers complaints to the courthouse? Many more questions than answers would present themselves if the Court journeyed this way.

Our colleagues writing separately today supply no answers either. They agree that state-court judges are not proper defendants in this lawsuit because they are "in no sense adverse" to the parties whose cases they decide. *Post*, at 4 (opinion of ROBERTS, C. J.). At the same time, our colleagues say they would allow this case to proceed against clerks like Ms. Clarkston. See *ibid.*; see also *post*, at 7 (opinion of SOTOMAYOR, J.). But in doing so they fail to address the many remedial questions their path invites. They neglect to explain how clerks who merely docket S. B. 8 lawsuits can be considered "adverse litigants" for Article III purposes while the judges they serve cannot. And they fail to reconcile their views with *Ex parte Young*. THE CHIEF JUSTICE acknowledges, for example, that clerks set in motion the "'machinery'" of court proceedings. *Post*, at 3. Yet

Opinion of the Court

he disregards *Ex parte Young*'s express teaching against enjoining the "machinery" of courts. 209 U. S., at 163.

JUSTICE SOTOMAYOR seems to admit at least part of the problem. She concedes that older "wooden" authorities like *Ex parte Young* appear to prohibit suits against state-court clerks. *Post*, at 7. Still, she insists, we should disregard those cases in favor of more "modern" case law. *Ibid.* In places, THE CHIEF JUSTICE's opinion seems to pursue much the same line of argument. See *post*, at 4. But even overlooking all the other problems attending our colleagues' "clerks-only" theory, the authorities they cite do not begin to do the work attributed to them.

Most prominently, our colleagues point to *Pulliam*. But that case had nothing to do with state-court clerks, injunctions against them, or the doctrine of sovereign immunity. Instead, the Court faced only the question whether the suit before it could proceed against a judge consistent with the distinct doctrine of judicial immunity. 466 U. S., at 541–543. As well, the plaintiff sought an injunction only to prevent the judge from enforcing a rule of her own creation. *Id.*, at 526. No one asked the Court to prevent the judge from processing the case consistent with state statutory law, let alone undo *Ex parte Young*'s teaching that federal courts lack such power under traditional equitable principles. Tellingly, our colleagues do not read *Pulliam* to authorize claims against state-court judges in this case. And given that, it is a mystery how they might invoke the case as authority for claims against (only) state-court clerks, officials *Pulliam* never discussed.

If anything, the remainder of our colleagues' cases are even further afield. *Mitchum* v. *Foster* did not involve state-court clerks, but a judge, prosecutor, and sheriff. See 315 F. Supp. 1387, 1388 (ND Fla. 1970) (*per curiam*). When it came to these individuals, the Court held only that the Anti-Injunction Act did not bar suit against them. 407 U. S. 225, 242–243 (1972). Once more, the Court did not purport

Opinion of the Court

to pass judgment on any sovereign immunity defense, let alone suggest any disagreement with *Ex parte Young*. To the contrary, the Court went out of its way to emphasize that its decision should not be taken as passing on the question whether "principles of equity, comity, and federalism" might bar the suit. 407 U. S., at 243. Meanwhile, *Shelley* v. *Kraemer* did not even involve a pre-enforcement challenge against any state-official defendant. 334 U. S. 1 (1948). There, the petitioners simply sought to raise the Constitution as a *defense* against other private parties seeking to enforce a restrictive covenant, *id.*, at 14, much as the petitioners here would be able to raise the Constitution as a defense in any S. B. 8 enforcement action brought by others against them. Simply put, nothing in any of our colleagues' cases supports their novel suggestion that we should allow a pre-enforcement action for injunctive relief against state-court clerks, all while simultaneously holding the judges they serve immune.

### B

Perhaps recognizing the problems with their court-and-clerk theory, the petitioners briefly advance an alternative. They say they seek to enjoin the Texas attorney general from enforcing S. B. 8. Such an injunction, the petitioners submit, would also automatically bind any private party who might try to bring an S. B. 8 suit against them. Reply Brief for Petitioners 21. But the petitioners barely develop this back-up theory in their briefing, and it too suffers from some obvious problems.

Start with perhaps the most straightforward. While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S. B. 8 that a federal court might enjoin him from exercising. Maybe the closest the petitioners come is when they point to a state

statute that says the attorney general "may institute an action for a civil penalty of $1,000" for violations of "this subtitle or a rule or order adopted by the [Texas Medical B]oard." Tex. Occ. Code Ann. §165.101 (West 2012). But the qualification "this subtitle" limits the attorney general's enforcement authority to the Texas Occupational Code, specifically §§151.001 through 171.024. By contrast, S. B. 8 is codified in the Texas Health and Safety Code at §§171.201–171.212. The Act thus does not fall within "this subtitle." Nor have the petitioners identified for us any "rule or order adopted by the" Texas Medical Board related to S. B. 8 that the attorney general might enforce against them. To be sure, some of our colleagues suggest that the Board might in the future promulgate such a rule and the attorney general might then undertake an enforcement action. *Post*, at 3 (opinion of ROBERTS, C. J.) (citing 22 Tex. Admin. Code §190.8(7) (West 2021)). But this is a series of hypotheticals and an argument even the petitioners do not attempt to advance for themselves.

Even if we could overcome this problem, doing so would only expose another. Supposing the attorney general did have some enforcement authority under S. B. 8, the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S. B. 8 suits. The equitable powers of federal courts are limited by historical practice. *Atlas Life Ins. Co.* v. *W. I. Southern, Inc.*, 306 U. S. 563, 568 (1939). "A court of equity is as much so limited as a court of law." *Alemite Mfg. Corp.* v. *Staff*, 42 F. 2d 832 (CA2 1930) (L. Hand, J.). Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may "lawfully enjoin the world at

Opinion of GORSUCH, J.

large," *ibid.*, or purport to enjoin challenged "laws them-selves," *Whole Woman's Health*, 594 U. S., at ___ (slip op., at 1) (citing *California* v. *Texas*, 593 U. S. ___, ___ (2021) (slip op., at 8)).

Our colleagues offer no persuasive reply to this problem. THE CHIEF JUSTICE does not address it.     Meanwhile, JUSTICE SOTOMAYOR offers a radical answer, suggesting once more that this Court should cast aside its precedents requiring federal courts to abide by traditional equitable principles.     *Post*, at 9, n. 3.     This time, however, JUSTICE SOTOMAYOR does not claim to identify any countervailing authority to support her proposal.     Instead, she says, it is justified purely by the fact that the State of Texas in S. B. 8 has "delegat[ed] its enforcement authority to the world at large." *Ibid.*     But somewhat analogous complaints could be levied against private attorneys general acts, statutes al-lowing for private rights of action, tort law, federal anti-trust law, and even the Civil Rights Act of 1964.     In some sense all of these laws "delegate" the enforcement of public policy to private parties and reward those who bring suits with "bount[ies]" like exemplary or statutory damages and attorney's fees.     Nor does JUSTICE SOTOMAYOR explain where her novel plan to overthrow this Court's precedents and expand the equitable powers of federal courts would stop—or on what theory it might plausibly happen to reach just this case or maybe those exactly like it.[2]

## C

While this Court's precedents foreclose some of the peti-tioners' claims for relief, others survive.     The petitioners

---

[2]This is not to say that the petitioners, or other abortion providers, lack potentially triable state-law claims that S. B. 8 improperly dele-gates state law enforcement authority.     Nor do we determine whether any particular S. B. 8 plaintiff possesses standing to sue under state jus-ticiability doctrines.     We note only that such arguments do not justify federal courts abandoning traditional limits on their equitable authority and our precedents enforcing them.

also name as defendants Stephen Carlton, Katherine Thomas, Allison Benz, and Cecile Young. On the briefing and argument before us, it appears that these particular defendants fall within the scope of *Ex parte Young*'s historic exception to state sovereign immunity. Each of these individuals is an executive licensing official who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code, including S. B. 8. See, *e.g.*, Tex. Occ. Code Ann. §164.055(a); Brief for Petitioners 33–34. Accordingly, we hold that sovereign immunity does not bar the petitioners' suit against these named defendants at the motion to dismiss stage.[3]

JUSTICE THOMAS alone reaches a different conclusion. He emphasizes that suits seeking equitable relief against executive officials are permissible only when supported by tradition. See *post*, at 2–3 (opinion concurring in part and dissenting in part). He further emphasizes that the relevant tradition here, embodied in *Ex parte Young*, permits equitable relief against only those officials who possess authority to enforce a challenged state law. *Post*, at 3–4. We agree with all of these principles; our disagreement is restricted to their application.

JUSTICE THOMAS suggests that the licensing-official defendants lack authority to enforce S. B. 8 because that statute says it is to be "exclusively" enforced through private civil actions "[n]otwithstanding . . . any other law." See Tex. Health & Safety Code Ann. §171.207(a). But the same provision of S. B. 8 *also* states that the law "may not be construed to . . . limit the enforceability of any other laws that regulate or prohibit abortion." §171.207(b)(3). This saving clause is significant because, as best we can tell from the briefing before us, the licensing-official defendants *are*

---

[3]The petitioners may proceed against Ms. Young solely based on her authority to supervise licensing of abortion facilities and ambulatory surgical centers, and not with respect to any other enforcement authority under Chapter 171 of the Texas Health and Safety Code.

Opinion of GORSUCH, J.

charged with enforcing "other laws that regulate . . . abortion." Consider, for example, Texas Occupational Code §164.055, titled "Prohibited Acts Regarding Abortion." That provision states that the Texas Medical Board "shall take an appropriate disciplinary action against a physician who violates . . . Chapter 171, Health and Safety Code," a part of Texas statutory law that *includes* S. B. 8. Accordingly, it appears Texas law imposes on the licensing-official defendants a duty to enforce a law that "regulate[s] or prohibit[s] abortion," a duty expressly preserved by S. B. 8's saving clause. Of course, Texas courts and not this one are the final arbiters of the meaning of state statutory directions. See *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 500 (1941). But at least based on the limited arguments put to us at this stage of the litigation, it appears that the licensing defendants do have authority to enforce S. B. 8.[4]

In the face of this conclusion, JUSTICE THOMAS advances an alternative argument. He stresses that to maintain a suit consistent with this Court's *Ex parte Young* and Article III precedents, "it is not enough that petitioners 'feel inhibited'" or "'chill[ed]'" by the abstract possibility of an enforcement action against them. *Post*, at 6–7. Rather, they must show at least a credible threat of such an action against them. *Post*, at 7. Again, we agree with these observations in principle and disagree only on their application

———————
[4] Tending to confirm our understanding of the statute is the fact that S. B. 8 expressly prohibits "enforcement of Chapters 19 and 22, Penal Code, in response to violations of this subchapter." Tex. Health & Safety Code Ann. §171.207(a). This language suggests that the Texas Legislature knew how to prohibit collateral enforcement mechanisms when it adopted S. B. 8, and understood that it was necessary to do so. To read S. B. 8 as barring any collateral enforcement mechanisms without a specific exclusion would thus threaten to render this statutory language superfluous. See *Kallinen* v. *Houston*, 462 S. W. 3d 25, 28 (Tex. 2015) (courts should avoid treating any statutory language as surplusage); *Kungys* v. *United States*, 485 U. S. 759, 778 (1988) (same).

to the facts of this case. The petitioners have plausibly alleged that S. B. 8 has already had a direct effect on their day-to-day operations. See Complaint ¶¶103, 106–109. And they have identified provisions of state law that appear to impose a duty on the licensing-official defendants to bring disciplinary actions against them if they violate S. B. 8. In our judgment, this is enough at the motion to dismiss stage to suggest the petitioners will be the target of an enforcement action and thus allow this suit to proceed.

### D

While this interlocutory appeal focuses primarily on the Texas official defendants' motion to dismiss on grounds of sovereign immunity and justiciability, before we granted certiorari the Fifth Circuit also agreed to take up an appeal by the sole private defendant, Mr. Dickson. In the briefing before us, no one contests this decision. In his appeal, Mr. Dickson argues that the petitioners lack standing to sue him because he possesses no intention to file an S. B. 8 suit against them. Mr. Dickson has supplied sworn declarations so attesting. See, *e.g.*, Brief for Respondent Dickson 32. The petitioners do not contest this testimony or ask us to disregard it. Accordingly, on the record before us the petitioners cannot establish "personal injury fairly traceable to [Mr. Dickson's] allegedly unlawful conduct." *California* v. *Texas*, 593 U. S., at ___ (slip op., at 9) (internal quotation marks omitted). No Member of the Court disagrees with this resolution of the claims against Mr. Dickson.

### III

While this should be enough to resolve the petitioners' appeal, a detour is required before we close. JUSTICE SOTOMAYOR charges this Court with "shrink[ing]" from the task of defending the supremacy of the Federal Constitution over state law. *Post*, at 10. That rhetoric bears no relation to reality.

Opinion of the Court

The truth is, many paths exist to vindicate the supremacy of federal law in this area. Even aside from the fact that eight Members of the Court agree sovereign immunity does not bar the petitioners from bringing this pre-enforcement challenge in federal court, everyone acknowledges that other pre-enforcement challenges may be possible in state court as well.[5] In fact, 14 such state-court cases already seek to vindicate both federal and state constitutional claims against S. B. 8—and they have met with some success at the summary judgment stage. See *supra,* at 2. Separately, any individual sued under S. B. 8 may pursue state and federal constitutional arguments in his or her defense. See n. 1, *supra.* Still further viable avenues to contest the law's compliance with the Federal Constitution also may be possible; we do not prejudge the possibility. Given all this, JUSTICE SOTOMAYOR'S suggestion that the Court's ruling somehow "clears the way" for the "nullification" of federal law along the lines of what happened in the Jim Crow South not only wildly mischaracterizes the impact of today's decision, it cheapens the gravity of past wrongs. *Post*, at 11.

The truth is, too, that unlike the petitioners before us, those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments. This Court has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court. In fact, general federal question jurisdiction did not even exist for much of this Nation's history. See *Mims* v. *Arrow Financial Services, LLC*, 565 U. S. 368, 376 (2012). And pre-enforcement review under the statutory regime the petitioners invoke,

---

[5] JUSTICE SOTOMAYOR'S complaint thus isn't really about *whether* this case should proceed. It is only about *which* particular defendants the petitioners may sue in this particular lawsuit. And even when it comes to that question, JUSTICE SOTOMAYOR agrees with the Court regarding the proper disposition of several classes of defendants—state-court judges, licensing officials, and Mr. Dickson.

42 U. S. C. §1983, was not prominent until the mid-20th century.  See *Monroe* v. *Pape*, 365 U. S. 167, 180 (1961); see also R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 994 (7th ed. 2015).  To this day, many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one.  See, *e.g.*, *Snyder* v. *Phelps*, 562 U. S. 443 (2011) (First Amendment used as a defense to a state tort suit).

Finally, JUSTICE SOTOMAYOR contends that S. B. 8 "chills" the exercise of federal constitutional rights.  If nothing else, she says, this fact warrants allowing further relief in this case.  *Post*, at 1–2, 7–8.  Here again, however, it turns out that the Court has already and often confronted—and rejected—this very line of thinking.  As our cases explain, the "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. *Younger* v. *Harris*, 401 U. S. 37, 42, 50–51 (1971).  Instead, this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice.  See *Muskrat*, 219 U. S., at 361; *Ex parte Young*, 209 U. S., at 159–160.  The Court has consistently applied these requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right.  The petitioners are not entitled to a special exemption.

Maybe so, JUSTICE SOTOMAYOR replies, but what if other States pass legislation similar to S. B. 8?  Doesn't that possibility justify throwing aside our traditional rules?  *Post*, at 10.  It does not.  If other States pass similar legislation, pre-enforcement challenges like the one the Court approves today may be available in federal court to test the constitutionality of those laws.  Again, too, further pre-enforcement challenges may be permissible in state court and federal

Opinion of the Court

law may be asserted as a defense in any enforcement action. To the extent JUSTICE SOTOMAYOR seems to wish even *more* tools existed to combat this type of law, Congress is free to provide them. In fact, the House of Representatives recently passed a statute that would purport to preempt state laws like S. B. 8. See H. R. 3755, 117th Cong., 1st Sess. (2021). But one thing this Court may never do is disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day. At the end of that road is a world in which "[t]he division of power" among the branches of Government "could exist no longer, and the other departments would be swallowed up by the judiciary." 4 Papers of John Marshall 95 (C. Cullen ed. 1984).[6]

### IV

The petitioners' theories for relief face serious challenges but also present some opportunities. To summarize: (1) The Court unanimously rejects the petitioners' theory for relief against state-court judges and agrees Judge Jackson should be dismissed from this suit. (2) A majority reaches the same conclusion with respect to the petitioners' parallel theory for relief against state-court clerks. (3) With respect to the back-up theory of relief the petitioners present against Attorney General Paxton, a majority concludes that he must be dismissed. (4) At the same time, eight Justices hold this case may proceed past the motion to dismiss stage against Mr. Carlton, Ms. Thomas, Ms. Benz, and Ms. Young, defendants with specific disciplinary authority over medical licensees, including the petitioners. (5) Every Member of

_____

[6] JUSTICE SOTOMAYOR charges this Court with "delay" in resolving this case. See *post*, at 11. In fact, this case has received extraordinary solicitude at every turn. This Court resolved the petitioners' first emergency application in approximately two days. The Court then agreed to decide in the first instance the merits of an appeal pending in the Court of Appeals. The Court ordered briefing, heard argument, and issued an opinion on the merits—accompanied by three separate writings—all in fewer than 50 days.

18          WHOLE WOMAN'S HEALTH *v.* JACKSON

the Court accepts that the only named private-individual defendant, Mr. Dickson, should be dismissed.

The order of the District Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–463

_____

WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.*
AUSTIN REEVE JACKSON, JUDGE, DISTRICT
COURT OF TEXAS, 114TH DISTRICT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2021]

JUSTICE THOMAS, concurring in part and dissenting in part.

I join all but Part II–C of the Court's opinion. In my view, petitioners may not maintain suit against any of the governmental respondents under *Ex parte Young*, 209 U. S. 123 (1908).[1] I would reverse in full the District Court's denial of respondents' motions to dismiss and remand with instructions to dismiss the case for lack of subject-matter jurisdiction.

_____

[1] I also would hold that petitioners lack Article III standing. As I have explained elsewhere, abortion providers lack standing to assert the putative constitutional rights of their potential clients. See *June Medical Services L. L. C.* v. *Russo*, 591 U. S. ___, ___–___ (2020) (dissenting opinion) (slip op., at 12–14). Third-party standing aside, petitioners also have not shown injury or redressability for many of the same reasons they cannot satisfy *Ex parte Young*. For injury, petitioners have shown no likelihood of enforcement by any respondent, let alone that enforcement is "certainly impending." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 410 (2013) (internal quotation marks omitted). For redressability, we held last Term that a party may not "attack an unenforceable statutory provision," because this Court may not issue "an advisory opinion without the possibility of any judicial relief." *California* v. *Texas*, 593 U. S. ___, ___ (2021) (slip op., at 9) (internal quotation marks omitted); see also *Muskrat* v. *United States*, 219 U. S. 346, 361 (1911). Likewise here, petitioners seek a declaration that S. B. 8 is unlawful even though no respondent can or will enforce it.

Opinion of THOMAS, J.

To begin, there is no freestanding constitutional right to pre-enforcement review in federal court. See *Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200, 220 (1994) (Scalia, J., concurring in part and concurring in judgment). Such a right would stand in significant tension with the longstanding Article III principle that federal courts generally may not "give advisory rulings on the potential success of an affirmative defense before a cause of action has even accrued." *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 142 (2007) (THOMAS, J., dissenting); see also *Coffman* v. *Breeze Corps.*, 323 U. S. 316, 324 (1945) (a party may not "secur[e] an advisory opinion in a controversy which has not arisen").

That said, a party subject to imminent threat of state enforcement proceedings may seek a kind of pre-enforcement review in the form of a "negative injunction." This procedural device permits a party to assert "in equity . . . a defense that would otherwise have been available in the State's enforcement proceedings at law." *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, 262 (2011) (Kennedy, J., concurring); accord, *Douglas* v. *Independent Living Center of Southern Cal., Inc.*, 565 U. S. 606, 620 (2012) (ROBERTS, C. J., dissenting). In *Ex parte Young*, this Court recognized that use of this negative injunction against a governmental defendant provides a narrow exception to sovereign immunity. See 209 U. S., at 159–160. That exception extends no further than permitting private parties in some circumstances to prevent state officials from bringing an action to enforce a state law that is contrary to federal law.

The negative injunction remedy against state officials countenanced in *Ex parte Young* is a "standard tool of equity," J. Harrison, Ex Parte *Young*, 60 Stan. L. Rev. 989, 990 (2008), that federal courts have authority to entertain under their traditional equitable jurisdiction, see Judiciary

Opinion of THOMAS, J.

Act of 1789, §11, 1 Stat. 78.  As we have explained else-
where, a federal court's jurisdiction in equity extends no
further than "the jurisdiction in equity exercised by the
High Court of Chancery in England at the time of the adop-
tion of the Constitution and the enactment of the original
Judiciary Act."  *Grupo Mexicano de Desarrollo, S. A.* v. *Al-
liance Bond Fund, Inc.*, 527 U. S. 308, 318 (1999) (internal
quotation marks omitted).  For this reason, a negative in-
junction must fall "within some clear ground of equity ju-
risdiction."  *Boise Artesian Hot & Cold Water Co.* v. *Boise
City*, 213 U. S. 276, 285 (1909); see also *Missouri* v. *Jenkins*,
515 U. S. 70, 127 (1995) (THOMAS, J., concurring) ("[C]ourts
of equity must be governed by rules and precedents no less
than the courts of law").  Federal courts therefore lack
"power to create remedies previously unknown to equity ju-
risprudence."  *Grupo Mexicano,* 527 U. S., at 332.

The principal opinion "agree[s] with all of these princi-
ples."  *Ante,* at 12.  I part ways with the principal opinion
only in its conclusion that the four licensing-official re-
spondents are appropriate defendants under *Ex parte
Young.*  For at least two reasons, they are not.

First, an *Ex parte Young* defendant must have "some con-
nection with the enforcement of the act"—*i.e.*, "the right and
the power to enforce" the "act alleged to be unconstitu-
tional."  209 U. S., at 157, 161.  The only "act alleged to be
unconstitutional" here is S. B. 8.  And that statute explicitly
denies enforcement authority to any governmental official.
On this point, the Act is at least triply clear.  The statute
begins: "*Notwithstanding . . . any other law,* the require-
ments of this subchapter shall be enforced *exclusively*
through . . . private civil actions."  Tex. Health & Safety
Code Ann. §171.207(a) (West Cum. Supp. 2021) (emphasis
added).  The Act continues: "No enforcement of this sub-
chapter . . . in response to violations of this subchapter, may
be taken or threatened by this state . . . or an executive or
administrative officer or employee of this state."  *Ibid.*

Later on, S. B. 8 reiterates: "Any person, *other than an officer or employee of a state or local governmental entity in this state*, may bring a civil action." §171.208(a) (emphasis added). In short, the Act repeatedly confirms that respondent licensing officials, like any other governmental officials, "hav[e] no duty at all with regard to the act," and therefore cannot "be properly made parties to the suit." *Ex parte Young*, 209 U. S., at 158.

The principal opinion does not dispute the meaning of these provisions. Instead, it finds residual enforcement authority for the licensing officials elsewhere in S. B. 8. In its saving clause, the Act provides that no court may construe S. B. 8 as "limit[ing] the enforceability of any other laws that regulate or prohibit abortion." §171.207(b)(3). If one of these "other laws" permits a governmental official to enforce S. B. 8, the principal opinion reasons, the saving clause preserves that enforcement authority. The principal opinion then proposes that the Texas Medical Board may enforce S. B. 8 under §164.055 of the Texas Occupations Code. Thus, on that view, S. B. 8 permits the Medical Board to discipline physicians for violating the statute despite the Act's command that "the requirements of this subchapter shall be enforced *exclusively* through . . . private civil actions," "*[n]otwithstanding . . . any other law*." Tex. Health & Safety Code Ann. §171.207(a) (emphasis added).

Rather than introduce competing instructions in S. B. 8, I would read the Act as a "'harmonious whole.'" *Roberts* v. *Sea-Land Services, Inc.*, 566 U. S. 93, 100 (2012). By its terms, S. B. 8's saving clause preserves enforcement only of laws that "*regulate or prohibit abortion*." §171.207(b)(3) (emphasis added). Such laws include, for example, restrictions on late-term or partial-birth abortions. See §§171.044, 174.102. Section 164.055 of the Texas Occupations Code, by contrast, does not "regulate or prohibit abortion." As the principal opinion explains, that provision

Opinion of THOMAS, J.

merely grants authority to the Texas Medical Board to enforce *other* laws that *do* regulate abortion. See Tex. Occ. Code Ann. §164.055 (West 2012). Thus, the saving clause does not apply, and S. B. 8 explicitly forecloses enforcement of its requirements by the Texas Medical Board.[2]

The principal opinion contends that the Act "confirm[s its] understanding" by explicitly proscribing criminal prosecution. *Ante,* at 13, n. 3 (citing Tex. Health & Safety Code Ann. §171.207(a)). By withholding criminal enforcement authority, the principal opinion argues, S. B. 8 tacitly leaves at least some civil enforcement authority in place. But "[t]he force of any negative implication . . . depends on context." *Marx* v. *General Revenue Corp.*, 568 U. S. 371, 381 (2013). A statute may "indicat[e] that adopting a particular rule . . . was probably not meant to signal any exclusion." *Ibid.* (internal quotation marks omitted).

That is the case here. Again, S. B. 8 repeatedly bars governmental enforcement. See *supra,* at 3–4. That Texas identified a "specific example" of withheld enforcement authority alongside the Act's "general" proscription "is not inconsistent with the conclusion that [S. B. 8] sweeps as broadly as its language suggests." *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 226–227 (2008). Texas "may have simply intended to remove any doubt" that criminal prosecution is unavailable under S. B. 8. *Id.,* at 226; see also

––––––––––
[2] For the remaining licensing officials—the heads of the Texas Health and Human Services Commission, the Texas Board of Nursing, and the Texas Board of Pharmacy—the principal opinion identifies no law that connects these officials to S. B. 8 or overrides the Act's preclusion of governmental enforcement authority. Indeed, as to the Health and Human Services Commission, S. B. 8 explicitly forecloses enforcement authority. The Act states: "The commission shall enforce [Chapter 171] except for Subchapter H," where S. B. 8 is codified, "which shall be enforced exclusively through . . . private civil enforcement actions . . . and may not be enforced by the commission." Tex. Health & Safety Code Ann. §171.005 (West 2021).

Opinion of THOMAS, J.

*Yellen* v. *Confederated Tribes of Chehalis Reservation*, 594 U. S. ___, ___ (2021) (GORSUCH, J., dissenting) (slip op., at 14) ("illustrative examples can help orient affected parties and courts to Congress's thinking"). It is unsurprising that Texas repeated itself to make its point "doubly sure." *Barton* v. *Barr*, 590 U. S. __, __ (2020) (slip op., at 16). And, in all events, "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Ibid.*[3]

Second, even when there is an appropriate defendant to sue, a plaintiff may bring an action under *Ex parte Young* only when the defendant "threaten[s] and [is] about to commence proceedings." 209 U. S., at 156. Our later cases explain that "the prospect of state suit must be imminent." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 382 (1992). Here, none of the licensing officials has threatened enforcement proceedings against petitioners because none has authority to bring them. Petitioners do not and cannot dispute this point.

Rather, petitioners complain of the "chill" S. B. 8 has on the purported right to abortion. But as our cases make clear, it is not enough that petitioners "feel inhibited" because S. B. 8 is "on the books." *Younger* v. *Harris*, 401 U. S. 37, 42 (1971) (internal quotation marks omitted). Nor is a "vague allegation" of potential enforcement permissible. *Boise Artesian*, 213 U. S., at 285. To sustain suit against the licensing officials, whether under Article III or *Ex parte Young*, petitioners must show at least a credible and specific threat of enforcement to rescind their medical licenses or assess some other penalty under S. B. 8. See *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 159 (2014). Petitioners offer nothing to make this showing. Even if the

---

[3] Because the principal opinion's errors rest on misinterpretations of Texas law, the Texas courts of course remain free to correct its mistakes. See, *e.g., Estate of Thornton* v. *Caldor, Inc.*, 472 U. S. 703, 709, n. 8 (1985).

Opinion of THOMAS, J.

licensing-official respondents had enforcement authority, the chance of them using it is, at present, entirely "imaginary" and "speculative." *Younger*, 401 U. S., at 42.

The irony of this case is that S. B. 8 has generated more litigation against those who *oppose* abortion than those who *perform* it. Respondent Clarkston, a state-court clerk, reports that only three S. B. 8 complaints have been filed in the State of Texas, none of which has been served. Brief for Respondent Clarkston 9–10. The private litigants brought those actions only after a San Antonio doctor performed a postheartbeat abortion and openly advertised it in the Washington Post. See A. Braid, Why I Violated Texas's Extreme Abortion Ban, Washington Post*, Sept. 19, 2021, p. A31, col. 2. Opponents of abortion, meanwhile, have been sued 14 times in the Texas state courts, including by some of the very petitioners in this case. See Brief for Respondent Clarkston 10.[4] Petitioners cast aspersions on the Texas state courts, but those courts are not dawdling in these pre-enforcement actions. The Texas courts held summary-judgment hearings on November 10 and entered partial judgment for the abortion providers on December 9. See *Van Stean* v. *Texas*, No. D–1–GN–21–004179 (Dist. Ct. Travis Cty., Tex., Dec. 9, 2021). Simply put, S. B. 8's supporters are under greater threat of litigation than its detractors.

Despite the foregoing, the principal opinion indicates that the prospect of suit by the licensing respondents is imminent. It cites petitioners' complaint, but the only relevant paragraph conclusorily asserts a "risk [of] professional discipline" because certain respondents allegedly "retain the

─────────

[4] Dr. Braid also has filed suit in the Northern District of Illinois against the three *pro se* plaintiffs who filed S. B. 8 actions against him. See Complaint in *Braid* v. *Stilley,* No. 21–cv–5283 (Oct. 5, 2021), ECF Doc. 1. Two of the three S. B. 8 plaintiffs have made filings in the case, and both are proceeding *pro se.* Meanwhile, 12 attorneys, all from major law firms or interest groups, represent Dr. Braid.

authority and duty to enforce *other* statutes and regulations
. . . that could be triggered by a violation of S. B. 8." Com-
plaint ¶107.  This "conclusory statemen[t]," paired with a
bare "'legal conclusion,'" cannot survive a motion to dis-
miss.  *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678 (2009).

\*    \*    \*

I would instruct the District Court to dismiss this case
against all respondents, including the four licensing offi-
cials, because petitioners may not avail themselves of the
exception to sovereign immunity recognized in *Ex parte
Young.*  I join the Court's opinion in all other respects and
respectfully dissent only from Part II–C.

Opinion of ROBERTS, C.J.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–463

_____

WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.*
AUSTIN REEVE JACKSON, JUDGE, DISTRICT
COURT OF TEXAS, 114TH DISTRICT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2021]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring in the judgment in part and dissenting in part.

Texas has passed a law banning abortions after roughly six weeks of pregnancy. See S. B. 8, 87th Leg., Reg. Sess. (2021). That law is contrary to this Court's decisions in *Roe* v. *Wade*, 410 U. S. 113 (1973), and *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). It has had the effect of denying the exercise of what we have held is a right protected under the Federal Constitution.[1]

Texas has employed an array of stratagems designed to shield its unconstitutional law from judicial review. To cite just a few, the law authorizes "[a]ny person," other than a government official, to bring a lawsuit against anyone who

---

[1] The law states that abortion providers may raise an "undue burden" defense, see *ante,* at 2, but that defense is no more than a distorted version of the undue burden standard set forth in *Casey*, 505 U. S. 833. The defense in the statute does not, for example, allow defendants to rely on the effect that an award of relief would have on others throughout the State, see Tex. Health & Safety Code Ann. §171.209(d)(2) (West Cum. Supp. 2021), even though our precedents specifically permit such reliance. *June Medical Services L. L. C.* v. *Russo,* 591 U. S. ___, ___–___ (2020) (opinion of BREYER, J.) (slip op., at 32–35). The provision, after all, is entitled "Undue Burden Defense *Limitations*." See §171.209 (emphasis added).

Opinion of ROBERTS, C. J.

"aids or abets," or intends to aid or abet, an abortion performed after roughly six weeks; has special preclusion rules that allow multiple lawsuits concerning a single abortion; and contains broad venue provisions that allow lawsuits to be brought in any of Texas's 254 far flung counties, no matter where the abortion took place. See Tex. Health & Safety Code Ann. §§171.208(a), (e)(5), 171.210 (West Cum. Supp. 2021). The law then provides for minimum liability of $10,000 plus costs and fees, while barring defendants from recovering their own costs and fees if they prevail. §§171.208(b), (i). It also purports to impose backward-looking liability should this Court's precedents or an injunction preventing enforcement of the law be overturned. §§171.208(e)(2), (3). And it forbids many state officers from directly enforcing it. §171.207.

These provisions, among others, effectively chill the provision of abortions in Texas. Texas says that the law also blocks any pre-enforcement judicial review in federal court. On that latter contention, Texas is wrong. As eight Members of the Court agree, see *ante,* at 11, petitioners may bring a pre-enforcement suit challenging the Texas law in federal court under *Ex parte Young,* 209 U. S. 123 (1908), because there exist state executive officials who retain authority to enforce it. See, *e.g.,* Tex. Occ. Code Ann. §164.055(a) (West 2021). Given the ongoing chilling effect of the state law, the District Court should resolve this litigation and enter appropriate relief without delay.

In my view, several other respondents are also proper defendants. First, under Texas law, the Attorney General maintains authority coextensive with the Texas Medical Board to address violations of S. B. 8. The Attorney General may "institute an action for a civil penalty" if a physician violates a rule or order of the Board. Tex. Occ. Code Ann. §165.101. The Board's rules—found in the Texas Administrative Code, see 22 Tex. Admin. Code §160.1(a) (West 2021)—prohibit licensed physicians from violating Texas's

Opinion of ROBERTS, C. J.

Health and Safety Code, which includes S. B. 8. See 22 Tex. Admin. Code §190.8(7) ("the Board shall take appropriate disciplinary action against a physician who violates . . . Chapter 171, Texas Health and Safety Code"); S. B. 8, 87th Leg., Reg. Sess. (2021) (amending Chapter 171 of the Texas Health and Safety Code by adding Subchapter H). Under Texas law, then, the Attorney General maintains authority to "take enforcement actions" based on violations of S. B. 8. *Ante,* at 12. He accordingly also falls within the scope of *Young*'s exception to sovereign immunity. *Ante,* at 9–10.

The same goes for Penny Clarkston, a court clerk. Court clerks, of course, do not "usually" enforce a State's laws. *Ante,* at 5. But by design, the mere threat of even unsuccessful suits brought under S. B. 8 chills constitutionally protected conduct, given the peculiar rules that the State has imposed. Under these circumstances, the court clerks who issue citations and docket S. B. 8 cases are unavoidably enlisted in the scheme to enforce S. B. 8's unconstitutional provisions, and thus are sufficiently "connect[ed]" to such enforcement to be proper defendants. *Young,* 209 U. S., at 157. The role that clerks play with respect to S. B. 8 is distinct from that of the judges. Judges are in no sense adverse to the parties subject to the burdens of S. B. 8. But as a practical matter clerks are—to the extent they "set[] in motion the machinery" that imposes these burdens on those sued under S. B. 8. *Sniadach* v. *Family Finance Corp. of Bay View,* 395 U. S. 337, 338 (1969).

The majority contends that this conclusion cannot be reconciled with *Young,* pointing to language in *Young* that suggests it would be improper to enjoin courts from exercising jurisdiction over cases. *Ante,* at 7–8; *Young,* 209 U. S., at 163. Decisions after *Young,* however, recognize that suits to enjoin state court proceedings may be proper. See *Mitchum* v. *Foster,* 407 U. S. 225, 243 (1972); see also *Pulliam* v. *Allen,* 466 U. S. 522, 525 (1984). And this conclusion is consistent with the entire thrust of *Young* itself. Just as

Opinion of ROBERTS, C. J.

in *Young*, those sued under S. B. 8 will be "harass[ed] . . . with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment." 209 U. S., at 160. Under these circumstances, where the mere "commencement of a suit," and in fact just the threat of it, is the "actionable injury to another," the principles underlying *Young* authorize relief against the court officials who play an essential role in that scheme. *Id.,* at 153. Any novelty in this remedy is a direct result of the novelty of Texas's scheme.[2]

\*　　\*　　\*

The clear purpose and actual effect of S. B. 8 has been to nullify this Court's rulings. It is, however, a basic principle that the Constitution is the "fundamental and paramount law of the nation," and "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Indeed, "[i]f the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery." *United States* v. *Peters*, 5 Cranch 115, 136 (1809). The nature of the federal right infringed does not matter; it is the role of the Supreme Court in our constitutional system that is at stake.

---

[2]A recent summary judgment ruling in state court found S. B. 8 unconstitutional in certain respects, not including the ban on abortions after roughly six weeks. See *ante*, at 2, 15. That order—which does not grant injunctive relief and has not yet been considered on appeal—does not legitimate the State's effort to legislate away a federally protected right.

Opinion of SOTOMAYOR, J.

# SUPREME COURT OF THE UNITED STATES

————

No. 21–463

————

## WHOLE WOMAN'S HEALTH, ET AL., PETITIONERS *v.* AUSTIN REEVE JACKSON, JUDGE, DISTRICT COURT OF TEXAS, 114TH DISTRICT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2021]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, concurring in the judgment in part and dissenting in part.

For nearly three months, the Texas Legislature has substantially suspended a constitutional guarantee: a pregnant woman's right to control her own body. See *Roe* v. *Wade*, 410 U. S. 113 (1973); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). In open defiance of this Court's precedents, Texas enacted Senate Bill 8 (S. B. 8), which bans abortion starting approximately six weeks after a woman's last menstrual period, well before the point of fetal viability. Since S. B. 8 went into effect on September 1, 2021, the law has threatened abortion care providers with the prospect of essentially unlimited suits for damages, brought anywhere in Texas by private bounty hunters, for taking any action to assist women in exercising their constitutional right to choose. The chilling effect has been near total, depriving pregnant women in Texas of virtually all opportunity to seek abortion care within their home State after their sixth week of pregnancy. Some women have vindicated their rights by traveling out of State. For the many women who are unable to do so, their only alternatives are to carry unwanted pregnancies to

Opinion of SOTOMAYOR, J.

term or attempt self-induced abortions outside of the medical system.

The Court should have put an end to this madness months ago, before S. B. 8 first went into effect. It failed to do so then, and it fails again today. I concur in the Court's judgment that the petitioners' suit may proceed against certain executive licensing officials who retain enforcement authority under Texas law, and I trust the District Court will act expeditiously to enter much-needed relief. I dissent, however, from the Court's dangerous departure from its precedents, which establish that federal courts can and should issue relief when a State enacts a law that chills the exercise of a constitutional right and aims to evade judicial review. By foreclosing suit against state-court officials and the state attorney general, the Court effectively invites other States to refine S. B. 8's model for nullifying federal rights. The Court thus betrays not only the citizens of Texas, but also our constitutional system of government.

I

I have previously described the havoc S. B. 8's unconstitutional scheme has wrought for Texas women seeking abortion care and their medical providers.[1] I do not repeat those details here, but I briefly outline the law's numerous procedural and substantive anomalies, most of which the Court simply ignores.

S. B. 8 authorizes any person—who need not have any relationship to the woman, doctor, or procedure at issue—to sue, for at least $10,000 in damages, anyone who performs, induces, assists, or even intends to assist an abortion in violation of Texas' unconstitutional 6-week ban. See Tex. Health & Safety Code Ann. §171.208(a) (West Cum. Supp.

_____

[1] See *United States* v. *Texas*, 595 U. S. ___, ___–___ (2021) (SOTOMAYOR, J., concurring in part and dissenting in part) (slip op., at 4–7); *Whole Woman's Health* v. *Jackson*, 594 U. S. ___, ___–___ (2021) (SOTOMAYOR, J., dissenting) (slip op., at 1–3).

Opinion of SOTOMAYOR, J.

2021). Those vulnerable to suit might include a medical provider, a receptionist, a friend who books an appointment, or a ride-share driver who takes a woman to a clinic.

Importantly, S. B. 8 also modifies state-court procedures to make litigation uniquely punitive for those sued. It allows defendants to be haled into court in any county in which a plaintiff lives, even if that county has no relationship to the defendants or the abortion procedure at issue. §171.210(a)(4). It gives the plaintiff a veto over any venue transfer, regardless of the inconvenience to the defendants. §171.210(b). It prohibits defendants from invoking nonmutual issue or claim preclusion, meaning that if they prevail, they remain vulnerable to suit by any other plaintiff anywhere in the State for the same conduct. §171.208(e)(5). It also bars defendants from relying on any nonbinding court decision, such as persuasive precedent from other trial courts. §171.208(e)(4). Although it guarantees attorney's fees and costs to prevailing plaintiffs, §171.208(b)(3), it categorically denies them to prevailing defendants, §171.208(i), so they must finance their own defenses no matter how frivolous the suits. These provisions are considerable departures from the norm in Texas courts and in most courts across the Nation.[2]

S. B. 8 further purports to limit the substantive defenses

───────────

[2] S. B. 8's procedural meddling is not limited to suits filed under the law. To deter efforts to seek pre-enforcement review, the law also establishes a special fee-shifting provision for affirmative challenges to Texas abortion laws, including S. B. 8 itself. Under that provision, any person or entity, including an attorney or a law firm, who seeks declaratory or injunctive relief against the enforcement of any state restriction on abortion is jointly and severally liable to pay the costs and attorney's fees of a prevailing party. Tex. Civ. Prac. & Rem. Code Ann. §30.022 (West Cum. Supp. 2021). The provision specifies that it is "not a defense" to liability for attorney's fees if "the court in the underlying action held that" any part of the fee-shifting provision "is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion." §30.022(d)(3).

that defendants may raise. It permits what it calls an "undue burden" defense, but redefines that standard to be a shell of what the Constitution requires: Rather than considering the law's cumulative effect on abortion access, see *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. 582, 609–624 (2016), it instructs state courts to focus narrowly on the effect on the parties, §§171.209(b)(2), (d)(2). It further purports to impose retroactive liability for abortion care provided while the law is enjoined if the injunction is later overturned on appeal, §171.208(e)(3), as well as for abortion care provided while *Roe* and *Casey* are in effect if this Court later overrules one of those cases, §171.209(e).

As a whole, these provisions go beyond imposing liability on the exercise of a constitutional right. If enforced, they prevent providers from seeking effective pre-enforcement relief (in both state and federal court) while simultaneously depriving them of effective post-enforcement adjudication, potentially violating procedural due process. To be sure, state courts cannot restrict constitutional rights or defenses that our precedents recognize, nor impose retroactive liability for constitutionally protected conduct. Such actions would violate a state officer's oath to the Constitution. See U. S. Const., Art. VI, cl. 3. Unenforceable though S. B. 8 may be, however, the threat of its punitive measures creates a chilling effect that advances the State's unconstitutional goals.

## II

This Court has confronted State attempts to evade federal constitutional commands before, including schemes that forced parties to expose themselves to catastrophic liability as state-court defendants in order to assert their rights. Until today, the Court had proven equal to those challenges.

In 1908, this Court decided *Ex parte Young*, 209 U. S. 123. In *Young*, the Court considered a Minnesota law fixing

Opinion of SOTOMAYOR, J.

new rates for railroads and adopting high fines and penalties for failure to comply with the rates. *Id.,* at 128–129, 131. The law purported to provide no option to challenge the new rates other than disobeying the law and taking "the risk . . . of being subjected to such enormous penalties." *Id.,* at 145. Because the railroad officers and employees "could not be expected to disobey any of the provisions . . . at the risk of such fines and penalties," the law effectively resulted in "a denial of any hearing to the company." *Id.,* at 146.

The Court unequivocally rejected this design. Concluding that the legislature could not "preclude a resort to the courts . . . for the purpose of testing [the law's] validity," the Court decided the companies could obtain pre-enforcement relief by suing the Minnesota attorney general based on his "connection with the enforcement" of the challenged act. *Id.,* at 146, 157. The Court so held despite the fact that the attorney general's only such connection was the "general duty imposed upon him, which includes the right and the power to enforce the statutes of the State, including, of course, the act in question." *Id.,* at 161. Over the years, "the *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 105 (1984) (quoting *Young*, 209 U. S., at 160); accord, *e.g., Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, 254–255 (2011).

Like the stockholders in *Young*, abortion providers face calamitous liability from a facially unconstitutional law. To be clear, the threat is not just the possibility of money judgments; it is also that, win or lose, providers may be forced to defend themselves against countless suits, all across the State, without any prospect of recovery for their losses or expenses. Here, as in *Young*, the "practical effect of [these] coercive penalties for noncompliance" is "to foreclose all access to the courts," "a constitutionally intolerable choice."

Opinion of SOTOMAYOR, J.

*Thunder Basin Coal Co.* v. *Reich*, 510 U. S. 200, 218 (1994). "It would be an injury to [a] complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity." *Young*, 209 U. S., at 160. In fact, the circumstances at hand present an even stronger need for pre-enforcement relief than in *Young*, given how S. B. 8 not only threatens a multiplicity of suits, but also turns state-court procedures against providers to ensure they cannot effectively defend their rights in a suit.

Under normal circumstances, providers might be able to assert their rights defensively in state court. See *ante,* at 15. These are not normal circumstances. S. B. 8 is structured to thwart review and result in "a denial of any hearing." *Young*, 209 U. S., at 146. To that end, the law not only disclaims direct enforcement by state officials to frustrate pre-enforcement review, but also skews state-court procedures and defenses to frustrate post-enforcement review. The events of the last three months have shown that the law has succeeded in its endeavor. That is precisely what the Court in *Young* sought to avoid. It is therefore inaccurate to characterize the foregoing analysis as advocating "an unqualified right to pre-enforcement review of constitutional claims in federal court." *Ante,* at 15. If that were so, the same charge could be leveled against the Court's decision in *Young*.

In addition, state-court clerks are proper defendants in this action. This Court has long recognized that "the action of state courts and judicial officers in their official capacities is to be regarded as action of the State." *Shelley* v. *Kraemer*, 334 U. S. 1, 14 (1948). In *Shelley*, private litigants sought to enforce restrictive racial covenants designed to preclude Black Americans from home ownership and to preserve residential segregation. The Court explained that these ostensibly private covenants involved state action because "but

Opinion of SOTOMAYOR, J.

for the active intervention of the state courts, supported by the full panoply of state power," the covenants would be unenforceable. *Id.,* at 19. Here, there is more. S. B. 8's formidable chilling effect, even before suit, would be nonexistent if not for the state-court officials who docket S. B. 8 cases with lopsided procedures and limited defenses. Because these state actors are necessary components of that chilling effect and play a clear role in the enforcement of S. B. 8, they are proper defendants.

These longstanding precedents establish how, and why, the Court should authorize relief against these officials as well. The Court instead hides behind a wooden reading of *Young*, stitching out-of-context quotations into a cover for its failure to act decisively. The Court relies on dicta in *Young* stating that "the right to enjoin an individual . . . does not include the power to restrain a court from acting in any case brought before it" and that "an injunction against a state court would be a violation of the whole scheme of our Government." 209 U. S., at 163. Modern cases, however, have recognized that suit may be proper even against state-court judges, including to enjoin state-court proceedings. See *Mitchum* v. *Foster*, 407 U. S. 225, 243 (1972); see also *Pulliam* v. *Allen*, 466 U. S. 522, 525 (1984). The Court responds that these cases did not expressly address sovereign immunity or involve court clerks. *Ante,* at 8–9. If language in *Young* posed an absolute bar to injunctive relief against state-court proceedings and officials, however, these decisions would have been purely advisory.

Moreover, the Court has emphasized that "the principles undergirding the *Ex parte Young* doctrine" may "support its application" to new circumstances, "novelty notwithstanding." *Stewart*, 563 U. S., at 261. No party has identified any prior circumstance in which a State has delegated an enforcement function to the populace, disclaimed official enforcement authority, and skewed state-court procedures

to chill the exercise of constitutional rights. Because S. B. 8's architects designed this scheme to evade *Young* as historically applied, it is especially perverse for the Court to shield it from scrutiny based on its novelty.[3]

Next, the Court claims that *Young* cannot apply because state-court clerks are not adverse to the petitioners. *Ante,* at 5–6. As THE CHIEF JUSTICE explains, however, *ante,* at 3 (opinion concurring in judgment in part and dissenting in part), the Texas Legislature has ensured that docketing S. B. 8 cases is anything but a neutral action. With S. B. 8's extreme alterations to court procedure and substantive defenses, the Texas court system no longer resembles a neutral forum for the adjudication of rights; S. B. 8 refashions that system into a weapon and points it directly at the petitioners. Under these circumstances, the parties are sufficiently adverse.

Finally, the Court raises "the question of remedy." *Ante,* at 6. For the Court, that question cascades into many others about the precise contours of an injunction against Texas court clerks in light of state procedural rules. *Ante,* at 6–7. Vexing though the Court may find these fact-intensive questions, they are exactly the sort of tailoring work that District Courts perform every day. The Court should have afforded the District Court an opportunity to craft appropriate relief before throwing up its hands and declaring the task unworkable. For today's purposes, the answer is

---

[3] The Court responds by seizing on my mention of S. B. 8's chilling effect. *Ante,* at 16. No one contends, however, that pre-enforcement review should be available whenever a state law chills the exercise of a constitutional right. Rather, as this Court explained in *Young,* pre-enforcement review is necessary "when the penalties for disobedience are . . . so enormous" as to have the same effect "as if the law in terms prohibited the [litigant] from seeking judicial construction of laws which deeply affect its rights." 209 U. S., at 147. All the more so here, where the State achieves its unconstitutional aim using novel procedural machinations that the Court fails to acknowledge.

Opinion of SOTOMAYOR, J.

simple: If, as our precedents make clear (and as the question presented presumes), S. B. 8 is unconstitutional, contrary state rules of civil procedure must give way.  See U. S. Const., Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land").

In the midst of its handwringing over remedy, the Court also complains that the petitioners offer no "meaningful limiting principles for their theory."  *Ante,* at 6.  That is incorrect.  The petitioners explain: "Where, as here, a State law (1) deliberately seeks to evade federal judicial review by outsourcing enforcement of the law to private individuals without any personal stake, while forbidding state executive officials from direct enforcement; and (2) creates special rules for state-court adjudication to maximize harassment and make timely and effective protection of constitutional rights impossible, federal relief against clerks is warranted."  Reply Brief for Petitioners 6.  The petitioners do not argue that pre-enforcement relief against state-court clerks should be available absent those two unique circumstances, and indeed, those circumstances are why the petitioners are threatened with a multiplicity of suits and face a constitutionally intolerable choice under *Young.*[4]

_____

[4] The Court also holds that the Texas attorney general is not a proper defendant.  For the reasons explained by THE CHIEF JUSTICE, *ante,* at 2–3, this conclusion fails even under the Court's own logic.

The Court further observes that "no court may 'lawfully enjoin the world at large.'"  *Ante,* at 10–11 (quoting *Alemite Mfg. Corp.* v. *Staff,* 42 F. 2d 832 (CA2 1930)).  But the petitioners do not seek such relief.  It is Texas that has taken the unprecedented step of delegating its enforcement authority to the world at large without requiring any pre-existing stake.  Under the Court's precedents, private actors who take up a State's mantle "exercise . . . a right or privilege having its source in state authority" and may "be described in all fairness as . . . state actor[s]."  *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 620 (1991).  This Court has not held that state actors who have actual notice of an injunction may

### III

My disagreement with the Court runs far deeper than a quibble over how many defendants these petitioners may sue. The dispute is over whether States may nullify federal constitutional rights by employing schemes like the one at hand. The Court indicates that they can, so long as they write their laws to more thoroughly disclaim all enforcement by state officials, including licensing officials. This choice to shrink from Texas' challenge to federal supremacy will have far-reaching repercussions. I doubt the Court, let alone the country, is prepared for them.

The State's concessions at oral argument laid bare the sweeping consequences of its position. In response to questioning, counsel for the State conceded that pre-enforcement review would be unavailable even if a statute imposed a bounty of $1,000,000 or higher. Tr. of Oral Arg. 50–53. Counsel further admitted that no individual constitutional right was safe from attack under a similar scheme. Tr. of Oral Arg. in *United States* v. *Texas*, No. 21–588, pp. 59–61, 64–65. Counsel even asserted that a State could further rig procedures by abrogating a state supreme court's power to bind its own lower courts. *Id.,* at 78–79. Counsel maintained that even if a State neutered appellate courts' power in such an extreme manner, aggrieved parties' only path to a federal forum would be to violate the unconstitutional law, accede to infringement of their substantive and procedural rights all the way through the state supreme court, and then, at last, ask this Court to grant discretionary certiorari review. *Ibid.* All of these burdens would layer atop

_____

flout its terms, even if it nominally binds other state officials, and it errs by implying as much now. The Court responds by downplaying how exceptional Texas' scheme is, but it identifies no true analogs in precedent. See *ante,* at 11 (identifying only "somewhat" analogous statutes). S. B. 8 is no tort or private attorneys general statute: It deputizes anyone to sue without establishing any pre-existing personal stake (*i.e.,* standing) and then skews procedural rules to favor these plaintiffs.

Opinion of SOTOMAYOR, J.

S. B. 8's existing manipulation of state-court procedures and defenses.

This is a brazen challenge to our federal structure. It echoes the philosophy of John C. Calhoun, a virulent defender of the slaveholding South who insisted that States had the right to "veto" or "nullif[y]" any federal law with which they disagreed. Address of J. Calhoun, Speeches of John C. Calhoun 17–43 (1843). Lest the parallel be lost on the Court, analogous sentiments were expressed in this case's companion: "The Supreme Court's *interpretations* of the Constitution are not the Constitution itself—they are, after all, called *opinions*." Reply Brief for Intervenors in No. 21–50949 (CA5), p. 4.

The Nation fought a Civil War over that proposition, but Calhoun's theories were not extinguished. They experienced a revival in the post-war South, and the violence that ensued led Congress to enact Rev. Stat. §1979, 42 U. S. C. §1983. "Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights." *Mitchum*, 407 U. S., at 240. Thus, §1983's "very purpose," consonant with the values that motivated the *Young* Court some decades later, was "to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum*, 407 U. S., at 242 (quoting *Ex parte Virginia*, 100 U. S. 339, 346 (1880)).

S. B. 8 raises another challenge to federal supremacy, and by blessing significant portions of the law's effort to evade review, the Court comes far short of meeting the moment. The Court's delay in allowing this case to proceed has had catastrophic consequences for women seeking to exercise their constitutional right to an abortion in Texas. These consequences have only rewarded the State's effort at nullification. Worse, by foreclosing suit against state-

court officials and the state attorney general, the Court clears the way for States to reprise and perfect Texas' scheme in the future to target the exercise of any right recognized by this Court with which they disagree.

This is no hypothetical. New permutations of S. B. 8 are coming. In the months since this Court failed to enjoin the law, legislators in several States have discussed or introduced legislation that replicates its scheme to target locally disfavored rights.[5] What are federal courts to do if, for example, a State effectively prohibits worship by a disfavored religious minority through crushing "private" litigation burdens amplified by skewed court procedures, but does a better job than Texas of disclaiming all enforcement by state officials? Perhaps nothing at all, says this Court.[6] Although some path to relief not recognized today may yet exist, the Court has now foreclosed the most straightforward route under its precedents. I fear the Court, and the country, will come to regret that choice.

*    *    *

In its finest moments, this Court has ensured that constitutional rights "can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor

---

[5] See Brief for Petitioners 48–49 (collecting examples targeting abortion rights and gun rights). In addition, one day after oral argument, Ohio legislators introduced a variation on S. B. 8 that would impose a near total ban on abortion care in that State. See H. B. 480, 134th Gen. Assem., Reg. Sess. (Ohio 2021).

[6] Not one of the Court's proffered alternatives addresses this concern. The Court deflects to Congress, *ante,* at 17, but the point of a constitutional right is that its protection does not turn on the whims of a political majority or supermajority. The Court also hypothesizes that state courts might step in to provide pre-enforcement relief, even where it has prohibited federal courts from doing so. *Ante,* at 15, 16. As the State concedes, however, the features of S. B. 8 that aim to frustrate pre-enforcement relief in federal court could have similar effects in state court, potentially limiting the scope of any relief and failing to eliminate the specter of endless litigation. Tr. of Oral Arg. 86–88.

Opinion of SOTOMAYOR, J.

nullified indirectly by them through evasive schemes . . . whether attempted 'ingeniously or ingenuously.'" *Cooper* v. *Aaron*, 358 U. S. 1, 17 (1958) (quoting *Smith* v. *Texas*, 311 U. S. 128, 132 (1940)). Today's fractured Court evinces no such courage. While the Court properly holds that this suit may proceed against the licensing officials, it errs gravely in foreclosing relief against state-court officials and the state attorney general. By so doing, the Court leaves all manner of constitutional rights more vulnerable than ever before, to the great detriment of our Constitution and our Republic.